44]    OHIO APPEALS AND CIRCUIT COURTS    83

Henry v. Cincinnati, L. & A. Elec. St. Ry.

## ACTIONS

[Hamilton (1st) Circuit Court, December 9, 1905.]

Giffen, Jelke and Swing, JJ.

Per Curiam.

---

## STREET RAILWAYS

[Hamilton (1st) Court of Appeals, May 28, 1915.]

Carpenter, Meals and Grant, JJ., of Eighth District Sitting by Designation.

AMY LOUIS HENRY v. CINCINNATI, L. & A. ELEC. ST. RY.

**Nonperformance of Duty by Conductor not Shown by Woman Thrown from Car after Protesting on Back Platform Failure to Stop Car at Her Station.**
A woman on an interurban car told the conductor she wished to get off at Stone's crossing, a regular stop. The car ran past that stop at a very high rate of speed. The woman rose and went out on the back platform to protest to the conductor for carrying her past her station. He replied, "I did," or "I have," and went forward in the car. The woman released her hold on the rail to turn and go back to her seat. As she did so a lurch of the car threw her off and she was badly injured. Her action for damages was based on nonperformance of an alleged legal duty arising from the fact that the conductor deserted her

while in a place of peril and in extricating herself she received the injuries complained of. *Held:* That the testimony failed to tend to fasten upon the railway company an unperformed legal duty, and there was therefore no error on the part of the court below in arresting the case from the jury and giving judgment for the defendant.

ERROR.

*Horstman & Horstman,* for plaintiff in error.

*Peck, Shaffer & Peck,* for defendant in error.

## GRANT, J.

By this petition in error we are asked to reverse the judgment of the court of common pleas in the cause thus entitled.

We adopt as our own the statement of the issues sought to be raised by the pleadings, made in the brief of the plaintiff in error, as follows:

"The amended petition says that on May 9, 1912, at about 7:45 A. M., plaintiff was a passenger on a car operated by defendant; that she informed the conductor that she wished to get off the car at Stone's Crossing, which was a regular stopping place for the cars of that line; that the conductor neglected to stop the car at that crossing, whereupon plaintiff, after attempting to attract the attention of the conductor, but being unable to do so, left her seat in the car and went on to the rear platform where the conductor was stationed, for the purpose of reminding the conductor that she wanted to get off the car at that station; that the conductor, when she told him he had carried her past the station, merely remarked 'I did' and immediately went forward into the car, leaving her standing alone on the rear platform of the car, which was then moving at an extremely high rate of speed, and as plaintiff was in the act of turning around to re-enter the car, she was thrown off the platform to the ground and very severely injured.

"The answer denies negligence on the part of defendant and avers that plaintiff was injured through her own negligence.

"The reply denies negligence on plaintiff's part."

At the conclusion of the evidence for plaintiff the court on motion arrested the testimony from the jury, and rendered judgment in favor of the defendant below.

Nor shall we be doing an injustice to the plaintiff by stating, as being substantially correct, her version of the evidence brought forward at the trial in support of her contention. It is as follows:

Henry v. Cincinnati, L. & A. Elec. Ry.

The plaintiff testified that she was 49 years of age and lived in Harrison, Ohio, at the time of the accident, May 9, 1912; that on that day at about 7:30 A. M., she entered the car which was going eastwardly at Harrison, and sat in the back end of the car on the first seat from the rear. "It was a side seat. As the car was coming towards the city I was on the right hand side. There was nobody on that side between me and the rear platform. I had been in the habit for two years last past of going on this car to Mr. Simonson's to clean house twice a year. When I paid my fare I said to the conductor 'I want to go to Mr. Zad. Simonson's. Put me off at Stone's Crossing.' When I got to the crossing he didn't stop the car, and when I saw those signs on the fence, after I passed those, I got up and I could not draw his attention, he was standing against this wheel looking off at a distance and I went out on the platform.

"Q. How did you try to attract his attention? A. Well, I stamped my foot and that is all the way, and he didn't look around and of course I didn't holler.

"Q. Which way was he looking? A. That way, looking across. I tried to attract his attention and could not. Before I got up he was a few steps from me. I suppose about the length of this crutch, maybe a little farther. When I failed to attract his attention I got up and I stepped out just like stepping off of this step. I says 'you have carried me by my stop.' Then he says 'I have' and that is all he did say.

"Q. What did he do? A. He just deliberately left me and went to the other end of the car and I supposed he was going to stop the car.

"Q. And what did you do then? A. Well, I turned to go back to my seat and I fell.

"Q. And did you try to get off the car? A. No, sir, I did not.

"Q. How fast was the car going just prior to your falling? A. Well, I suppose it was going at the rate of 60 miles an hour. It was going awful fast.

"Q. Did he say anything except 'I did' or 'I have'? A. That is all he said.

"Q. How soon after that did he leave you? A. Just as quick as he could walk away.

"Q. And how quick did you turn to go into the car? A. Just as quick as I could turn around. Stone's Crossing is a regular stop on that road.

"Cross-examination.—When he came to me to collect my fare I paid him a nickel and I said 'I am going to Zad Simonson's to clean house and put me off at Stone's Crossing.' He didn't say anything. Instead of stopping the car though as I had asked him, he carried me past.

"I didn't get up while the conductor was in front of the car. I am sure of that. He had collected all the fares and gone back to his post on the back platform. There was a step from the aisle of the car down on to this platform, a step of 6 or 8 inches. The door leading from the aisle to the platform was open. I tried to attract the conductor's attention. I stamped my foot. I could not attract his attention. He was standing with his back against the wheel, but looking off, not in my direction though. I got up out of my seat. I got hold of the door as I went out. The car was going at the rate of 60 miles an hour. It was going so fast, that is how I judged it, and I heard several say it was going that way. It was going an unusual speed. It usually runs very fast there.

"Q. And you stepped out on the platform? A. Yes, sir.

"Q. And didn't hold on to the door? A. No, I let go of the door. Of course I had to let go of the door to turn around and go back to my seat.

"Q. And when you stepped down on the platform there, you were right next to the conductor, were you not? A. I was, well, in a distance of a foot, I suppose, about a foot.

"Q. And then, what did you say to the conductor then? A. I said to him 'you have carried me by my stop,' and he just looked up and says 'I have,' and deliberately left me and went to the other end of the car. He left me standing where I was talking to him, never answered, only said 'I have.' He didn't ring the bell to stop the car.

"Q. How far in the car did he go? A. I don't know, when I turned around enough to go back to my seat, I turned around as quick as I could, he was standing there some place in the car.

"Q. You had turned around then after he left you? A. Of course I turned around to go back to my seat when he left me.

"Q. There are handles on the door on each side? A. Yes.

"Q. You didn't have hold of those? A. You think I could hold to those, turn around and go back to my seat?

"Q. After you turned around? A. Didn't have time. It threw me over. The switch of the car threw me over.

"Q. You said you saw the conductor? A. When I turned around before I fell I looked for the conductor, supposed he

Henry v. Cincinnati, L. & A. Elec. Ry.

would stop the car and he was standing back there and that is the last I remember.

"Q. Standing where? A. Well, in the rear of the car, I don't know where.

"Q. Looking at you? A. No sir, he was not looking at me because he had his back to me. There were no push buttons on that car by which to attract the attention of the conductor. If the conductor had been looking into the car he could have seen me without looking through any window pane."

Mr. George W. Bowlby, of Harrison, Ohio, was a passenger on the car. He did not see the accident happen, but assisted in picking up the plaintiff after the car came to a stop. He says the place where she fell was 300 yards distant from Stone's Crossing stop.

Several other passengers on that car testified that as they were all facing forward none of them saw how the accident happened.

In the light of the issue thus tendered by the pleadings and the testimony addressed to it, what duty did the defendant owe to the plaintiff? That is, to our apprehension, the single question to be answered in this inquiry, as a matter of first instance. That would be a question of law upon which the court must pass without aid from a jury. If no duty was owing, then the matter was rightly resolved by the trial judge directing the verdict that was returned in the case. If the testimony produced tended to establish a legal duty, owing by the defendant to the plaintiff, then the resulting question of whether the duty was performed and the obligation discharged, would have presented an issue of fact which it was the exclusive province of the jury to determine, upon such proper instructions as to the law of the case as the court should deem proper to give in charge.

There can be no impropriety in addressing our consideration to this inquiry of duty or no duty owing, at least so far as the plaintiff is concerned, in presenting, *in haec verba,* her precise claim in this respect, as the same is contained in the brief of her counsel.

It proceeds thus—up to the point where cases are cited in maintenance of the position taken:

"Plaintiff, by reason of the conductor's failure to stop

where he had been directed to stop, was compelled to act quickly. When Mrs. Henry noticed that she was being carried past Stone's Crossing, she stamped her foot and otherwise tried to attract the conductor's attention, but he was looking in another direction, so that Mrs. Henry was compelled to go towards him. The car was running at a high rate of speed and necessarily making noise. She was obliged either to step out on the platform to him or wait an indefinite length of time until he should look in her direction. We submit that under those circumstances almost any man or woman passenger would have stepped on to the platform to talk to the conductor. Did she under these circumstances exercise ordinary care on her part? We contend that circumstances were such that it presented a question of law for the court. This is not analogous to a case where a passenger deliberately rides on the rear platform when there is accommodation inside the car. The conductor's neglect caused Mrs. Henry to be on the platform and he was negligent in abruptly leaving her there unprotected. Considering the duty of the company to exercise the highest degree of care towards passengers and the fact that this passenger was a woman and that the car was going at such a very high rate of speed, the conductor surely was not acting humanely in leaving her exposed to that danger which she suffered. If he had remained on the platform she probably would not have fallen, and if she had lost her footing, he probably would have saved her from serious injury. Answering her abruptly and immediately going into the car without signalling for the car to stop or giving her any asurance that it would stop, he made it necessary for her to loosen her hold of whatever she had hold of and to turn around to go into the car again, and while in the act of so turning around she was thrown off the car. Any ordinary man seeing an aged woman on the rear platform of an interurban car going at such speed, would almost involuntarily assist the woman to a place of safety and yet this conductor deliberately hurried away from her. Can it be said that that is in law the exercise of the highest degree of care towards a passenger? And can it be said as a matter of law that because a woman who is carried beyond her destination and who can not otherwise attract the attention of the conductor, steps out on the platform to talk to him briefly, is guilty of negligence? She was called upon to act very quickly, by reason of the failure of the conductor to do his duty, and she could not be expected to weigh the question of how best to act as if she had had time to reflect and consider. Being a working woman she could not be expected to sit in the car patiently and be carried an indefinite distance beyond her destination, perhaps without means to get back, or at least not

Henry v. Cincinnati, L. & A. Elec. Ry.

able to get back in time to do her day's labor. It seems to us a very harsh judgment to accuse her of negligence in doing the only thing she could do to remedy the mistake of the conductor. As long as the conductor was within a foot of her on the platform there was not much danger to her because she had her protection and also the hand-hold of the door post, but when he left her abruptly he deprived her of both of those protections and made it necessary for her to let go in order to turn around to get into the car again. A passenger going to the conductor on the platform under those circumstances would naturally expect him to forthwith pull the bell rope and slow up and stop the car. If he had done that she would have been safe. He did not do that, but on the contrary acted in a way which naturally added to her embarrassment and doubt as to what he was going to do next. She had a right to wait a few moments to learn what he would do and then to turn around and see what he would do when he entered the car.''

We must give, of course, and *do* give, credence to whatsoever the evidence in terms states, so far as it bears upon the issue to which it is addressed, and we are also to deduce all proper inferences flowing from the facts thus brought to bear.

Allowing these, and still how stands the case? Whatever may have been the obligation of the defendant, whether contractural or imposed by law, not to carry its passenger beyond the designated stopping place, it is certain in this case that, after that default was complete, the plaintiff, for whatever reason, left a place of safety within the car and voluntarily went to a place which, or in leaving which, turned out to be, under the circumstances, a place of danger, where she came to her injuries sued for.

It is quite possible, we think, to give too much importance to the alleged abruptness of the conductor when the plaintiff told him her stopping place had been passed, or to put an unnecessarily unfavorable construction on what he then said to her. His tone of voice can not be reproduced on the record: that is certain. But we are inclined to think, under the circumstances, that his words, "I did," or "I have," were interrogatively meant. If this is so, and as a conjecture it is as good a one as one that would impute a want of feeling and derision of a poor woman's just claim to considerate treatment at a conductor's hands, then it is not unreasonable to conjecture further

that he in going forward in the car at that time, did so from a purpose of seeing whether the motorman still could not do something to allow the passenger to alight as near to her point of destination as was then practicable, and so save her day's work to her. We rather think this may have been the fact of the matter. But even so, or even otherwise, we can not regard this point as decisive of the breach of any legal obligation of duty from the defendant to the plaintiff, at that exact moment of time, or on account of that matter, in any light in which we may look at the conductor's act or conduct. Certain it is that when the conductor left the plaintiff and went forward, she having theretofore left a place of safety, was still in a place of safety, so far as appears, and which, had she not left that place of safety, for aught that is shown, would have continued to be a place of safety for her. When she changed that—when she abandoned her hold upon the door jamb of the car, and turned to resume her seat and place of safety, which she had in the first instance abandoned, and in so doing came to her hurts, the conductor was no longer where he could render to her the duty of humanity to safeguard her from an impending peril, and the absence of which seems to be imputed to him, and through him to his employing company, as a possibly actionable fault.

It is to be remembered that this is not an action to recover for the breach of a contract to carry a pasenger to her point of destination and to deliver her there safely, the violation of which resulted in her bodily harm. Something, perhaps, might be said for that kind of a claim. But this is not a suit so founded. It is an action for the nonperformance of an alleged legal duty, arising, so far as we can gather from the averments of the petition, from the charged fact that the conductor deserted the plaintiff while she was in a place of peril, and in extricating herself from which she received her injuries, as she says. The excessive speed of the car, acting in conjunction with the abandonment of her by the conductor, is not pressed in argument, and seems to have been pretty much non-existent, so far as to being a contributing factor in the injury is concerned.

The consideration of humanity alone, as such, however commendable in ethics and fireside law, is a matter of no signifi-

cance in a case where obligations imposed by positive law are alone to be dealt with and enforced.

The most, we think, that can be said, if so much, is that perhaps the fact that the conductor saw his already wronged passenger, that is, wronged by being carried by her contractural point of stopping, in a place which might by her leaving it, as she afterwards did leave it, become a place of danger, nevertheless left her there without warning, safeguard or precaution, this, we say, might, possibly, be assimilated to the *rationale* underlying the doctrine of last chance, so as to make the defendant amendable to the remedy which in such a case, *properly*, such a case, the law undertakes to advance and administer to effect, in accordance with the rights of the parties, issuably presented and proved.

We are not saying that this case, upon its own facts, is within the purview of the principle of the last chance rule. We say only that at most it could amount to no more in any view and when properly invoking the aid of that remedy. We are not called upon to say more.

The doctrine of last chance is not to be applied unless it is pleaded *Drown* v. *Traction Co.*, 76 Ohio St. 234 [81 N. E. 326; 10 L. R. A. (N. S.) 421; 118 Am. St. 844]. It was not pleaded in this case.

The authorities cited in the plaintiff's brief, are marshalled under two heads. The first is "Province of the Jury." Upon that we have said all that we care to say.

The second is "Duty of Conductor to Protect and Assist.".

These terms suggest the considerations upon which we have been remarking. No authority, it is supposed, can be brought forward to support the claim that it was the conductor's duty to prevent a passenger from leaving a place of safety of his own will, and going to one which may prove to be dangerous, the passenger being of full age, *compos mentis*, and not disguised by drink. A conductor is not charged with the duty of being the advisor of the passengers riding in his car, at his peril for giving bad advice, or for giving none at all in case it turns out through the act of the passenger alone that advice should have been given. Nor, under what we conceive to have been the cir-

cumstances of this case, do we think he was charged with a duty of protection to the plaintiff, unless, as we already have intimated, seeing her in peril his duty was not to recklessly or wantonly allow it to be visited upon her, he having it within his power to prevent the foreseen and impending danger. In this case, if that duty was violated, it was because the conductor deserted his passenger when he saw her in a place of danger. But it is at least questionable whether she was in a place of danger when the conductor left her, although the place in which she afterwards exposed herself became so, but not to his then knowledge. If, on the other hand, the facts were unquestioned, as we have found already, the debt of duty, if due and unperformed, in this case, which we do not say, the consideration is not before us or to be regarded, because the issue is not raised by the pleadings.

Upon a painstaking review of the record and all that has been said or printed by way of argument in the case, we can not say that there was any testimony fit to go to the jury upon the trial, because none of it tended to fasten upon the defendant an unperformed legal duty toward the plaintiff.

So finding, we find also that no error appears to have intervened in the case, and the judgment complained of is, therefore, affirmed.

CARPENTER and MEALS, JJ., concur.

---

## APPEAL—DISMISSAL AND NONSUIT

[Cuyahoga (8th) Circuit Court, November 6, 1907.]

Winch, Henry and Marvin, JJ.

### E. TALAMINI V. SOLOMON ULMER.

**Court may Dismiss Case Appealed from Justice by Defendant When Plaintiff is in Default for Petition.**

When a defendant has appealed from a judgment rendered by a justice of the peace, and the plaintiff has failed to file his petition within the time prescribed by law after the filing of the transcript from the justice, the court may enter a judgment of dismissal.

ERROR.

*H. Koblitz,* for plaintiff in error.

*Fred. Desberg,* for defendant in error.